CATERPILLAR TRACTOR
COMPANY, Appellant,

v.

Santiago GONZALES et al., Appellees.

No. 6617.

Court of Civil Appeals of Texas,
El Paso.

Dec. 28, 1977.

Rehearing Denied Jan. 25, 1978.

Wiley, Plunkett, Gibson & Allen, Robert A. Allen, Ronald Hornberger, San Antonio, for appellant.

Clark, Thornton & Summers, W. Burl Brock, San Antonio, for intervenor.

Gochman & Weir, Warren Weir, John Scarzafava, San Antonio, for appellees.

## OPINION

WARD, Justice.

This is a strict tort liability and negligence action where only a design defect is involved. The Plaintiff/operator, while alighting from his Caterpillar tractor-loader, slipped from the muddy step on the machine and was severely injured. Trial was to a jury which determined that the step on the machine was defectively designed by the manufacturer and this was a producing cause of the fall; and that the step was negligently designed by the manufacturer and this was a proximate cause of the fall. All defensive issues submitted on behalf of the manufacturer were rejected by the jury. Based upon the jury's verdict, judgment was entered that the Plaintiff recover from the manufacturer the sum of $252,991.05, a portion thereof being awarded to the intervenor workmen's compensation carrier by virtue of subrogation rights from the payment of the Plaintiff's workmen's compensation claim. Caterpillar appeals and we reverse and render.

The Plaintiff, Santiago Gonzales, age 29 at the time of the accident, had a sixth grade education and had been employed by Frio County for three years as a dump truck driver and as an operator of the front end loader. In April, 1971, Frio County purchased the 941 front end loader and the Plaintiff had been operating it from the start. During the one and one half years the machine was used, he had become familiar with its operation and had climbed up and down the 941 literally thousands of times, having had to climb on and off the machine some ten or fifteen times a day when he was the operator. He had frequently used it under the same wet weather condition as he encountered on the day of the accident, and had worked in mud and knew that on those occasions mud collected on the tracks and on the side of the machine, including the area where the step was located. At the time of the accident, the machine was being operated in a muddy caliche pit. The Plaintiff was familiar with muddy caliche and knew it was slippery. September 21, 1973, was a foggy and rainy day and the Plaintiff accumulated mud on his boots before he got up on the machine. He did not clean off his boots prior to dismounting. The step in question was a U-shaped step welded to the side of the roller frame guard between the tracks and was some 22 inches above the ground. For its protection, the outside of the step is located within the outside edges of the tracks. Of necessity, when a person dismounts, he has to lean backward to see the step. When the Plaintiff dismounted, he got up from his seat, turned around and faced the machine and grabbed the grab irons. He leaned back to see where the step was in order that he could put his foot in it and noticed that the step had mud on it. He placed his foot on the step, his foot slipped, his hands then slipped from the grab irons, and he fell backward to the ground and suffered his injuries.

The machine was a 941 Traxcavator, manufactured by Caterpillar in January, 1969. It was a comparatively small tractor front end loader standing some six feet in height with a bucket loader all across the front and a heavy ripper all across the rear of the machine. The step was manufactured from a flat piece of ¼th inch steel with two right angle bends in it to form a shallow U-shaped piece. The two legs were then welded to the rocker frame guard so that the step is parallel to the ground and thus protruding out from the roller frame, though, as stated, not as far as the outside edge of the tracks. To keep the foot from slipping sideways, there is a shallow notched pocket 8 inches wide and ½ inch deep designed as the area where the foot should be placed. As indicated, the step is located between the tracks, is 22 inches from the ground and 15 inches from the top track. The top track of the Caterpillar is used as a second step, and from the top of the track to the floor of the operator's station, there is an additional 14½ inch step. On the left side of the tractor, where the

accident occurred, there is a grab iron welded to the front side of the entrance to the operator's station, and on the back side of the entrance, a grab rail extends from over the top of the tractor to the bottom of the operator's station entrance. Since the step in question is U-shaped, dirt, mud and debris falling on it will tend to pass through and fall to the ground.

The Plaintiff's pleadings were to the effect that the step on the Caterpillar was defectively designed and that the defective design was a producing cause of the accident; that the Defendant negligently designed the step and that the negligence was a proximate cause of the accident. To sustain his position, the Plaintiff has relied on an expert's testimony and opinion that the design of the step was unreasonably dangerous and that it was negligently designed; that the design failed to meet three of the Defendant's own guidelines or standards regarding safety designs of steps; and finally, that a substitute was available which was inexpensive to construct and which remedied the one problem relative to mud on the Defendant's step. In this regard, the expert testified that when a person was getting off of the Caterpillar that the step was "extremely difficult to see." When the Caterpillar was operating in mud, the mud would accumulate on the bottom of the track which, like a conveyor, transported the mud around and deposited the mud in big clumps right on the step, and that the particular design "maximized the accumulation of debris." The step did not have anti-skid material on it, and it was so constructed that only one foot could be used in getting off of the machine. He testified that "you have to lean out and see to make you you don't put your foot where there isn't a step," and having to lean out in order to see the step posed an additional hazard.

A design reference had been worked up by the Defendant by the summer of 1968, and it provided that steps should be designed to minimize the accumulation of debris, that all steps should be coated with an anti-skid material, and that when steps were in series, they should be designed so that either foot might be used on any step. The Plaintiff's expert pointed to these references as the Defendant's standards which had been violated in the design of this particular step. Undoubtedly, the step was in a location where mud would be dropped on it. The ¼th inch step did not have any anti-skid material on it, and only one foot—the right—could comfortably be used on the left side of the machine.

As stated, the expert recommended the adoption of either of two remedial designs. One of these resembled somewhat a drawbridge which would fold out from the operator's station, could then be lowered by the operator out over the track, and the operator would then step on flat surfaces to the ground. The expert testified that the Company's three criteria mentioned would easily be met by each of the respective devices and each one of the devices could be folded out of the way in such a manner that they would not get knocked off and would never get covered with mud. Finally, the expert claimed that folding ladders were successfully used on other types of front end loaders and had been so used prior to the construction of the model 941.

Countering the above was the Defendant's testimony that a conscious design choice had been made by Caterpillar of the step after a careful evaluation of the intended function and use of the machine and the conditions that it was expected to encounter, and with the use of a planned step design for quick ingress to and egress from the operator's station. This was all done within the background that the step had been used thousands of times by numerous other operators under every conceivable kind of condition without complaint. The Defendant's design engineers testified that they felt that the guidelines in question were met; that the step itself provided a sharp edge which itself would be an anti-skid surface; that the step was designed so that mud and debris would drop to the ground in the opening of the U-shape; and that the leaning backward presented no problem as the system was designed so that the operator would have three limbs on the

system at all times—that is two hands and one foot.

The engineers were familiar with a retractable ladder and admitted that they were used on some front end loaders. However, they pointed out that they were used only on large wheeled vehicles where the devices were protected from damage by the large rubber tires. They further testified that up to the present time no track front end loader ever manufactured had used the retractable ladder system. The design decision forcing the simple step selection over the retractable ladder was based on many factors. As opposed to a wheel loader, which operates on relatively flat, dry surfaces, the track loader operates in all kinds of conditions—flat rocky floors, steep slopes, mud, dry dust, snow, against rock walls, and in heavy timber. These requirements were such that durable construction was absolutely required. Further, the problem of getting a retractable ladder that would go out and over the side of the tracks was insurmountable. Some machines worked with variable track widths. The folding ladder concept was very susceptible to damage from encounters with rocks, tree limbs, and debris. The ladders were also susceptible to damage from operator forgetfulness, that is one of the ladders not being retracted when the machine was started. Of the two designs suggested by the Plaintiff's expert as alternatives, the simplest one would have the step some 33 inches from the ground—a distance quite beyond the reach of 50% of all operators. The simple design also featured handles that would fold in front of the operator where the control area would be useless. As to the more complicated suggested drawbridge-type design, it was criticized as being a finger-pincher, a clothing-catcher, and from parts that protruded from the side of the vehicle when folded would eventually be knocked off or damaged in operating conditions where tractors would be used. Due to the work use contemplated for the machine, the folding ladder concept was thought to be absolutely impractical since the machine was designed for digging basements, working against high walls, for backfilling along the sides of houses, and for working in heavy timbers. Such tight construction work would prevent the operator from using any folding ladder while egressing, and the ladder would then be absolutely useless and in the way.

The following special issues and the jury's answers thereto established Caterpillar's primary liability:

"Question No. 1:

"Do you find, from a preponderance of the evidence, that the step on the Model 941 Caterpillar Traxcavator in question, was defectively designed at the time it was sold by defendant, Caterpillar Tractor Company?

"By the term 'defectively designed' is meant such a design as would create an unreasonable risk of harm to the ordinary user of the product involved when the product is used in the manner in which it was intended to be used.

"By the term 'unreasonable risk of harm' is meant such a risk of harm as is more dangerous than would be contemplated by the ordinary user who uses the product with ordinary knowledge.

"Answer 'It was,' or 'It was not.'

"We, the Jury, answer *It was.*"

"Question No. 4:

"Do you find, from a preponderance of the evidence, that defendant, Caterpillar Tractor Company, negligently designed the step on the Model 941 Caterpillar Traxcavator in question?

"'Negligently,' or 'Negligence,' means failure to use ordinary care, that is to say, failure to do that which a reasonable and prudent manufacturer engaged in the manufacture of like or similar equipment would have done under the same or similar circumstances, or doing that which a manufacturer with ordinary prudence would not have done under the same or similar circumstances.

"Answer 'We do,' or 'We do not.'

"We, the Jury, answer *We do.*"

The Defendant has "no evidence" points challenging the findings that the step was defectively designed and that the Defendant negligently designed the step. While these are not the first points raised by the Defendant, they are necessarily the decisive ones and therefore will now be disposed of.

We are in a foggy area at best when we attempt to determine liability for an alleged defect made as a result of a conscious design choice. As applied in this area in this State, Section 402A, 2 Restatement of Torts 2d (1965), requires that before strict liability can be applied, the product sold must be in a defective condition, unreasonably dangerous to the user or consumer. Defective condition and unreasonably dangerous are considered as one concept and the test applied is a bifurcated one adopted by the Supreme Court in *Henderson v. Ford Motor Company*, 519 S.W.2d 87 (Tex.1974); that to determine that the step was unreasonably dangerous, the factfinder has to decide that the step threatened harm to persons using it to the extent that the step *either* would not be used by a prudent manufacturer aware of the risks involved in its use, *or* that the step would not meet the reasonable expectations of the ordinary consumer as to its safety. See footnote, *General Motors Corporation v. Hopkins*, 548 S.W.2d 344 at 347 (Tex.1977).

By some form of osmosis, the above is transformed into a balancing test of weighing the risk of harm against the utility of the product where the factors suggested by Wade, "Strict Tort Liability of Manufacturers," 19 S.W.L.J. 5 at 17 (1965), can be used to determine the issue, though neither the balancing test nor the factors are submitted to the trier of the facts. Regardless of that, the factors involved in making the balancing test include, among others, the following:

" * * * (1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive."

*Rourke v. Garza*, 530 S.W.2d 794 at 799 (Tex.1975); see application in *Weakley v. Fischbach & Moore, Inc.*, 515 F.2d 1260 at 1267 (5th Cir. 1975).

As often happens in these cases, the evidence introduced and the method chosen by which the case is submitted to the jury creates a further area of uncertainty. The evidence was an attempt to aid the jury regarding the first part of the approved bifurcated instruction, that is the evidentiary battle was over what a prudent manufacturer aware of the risks involved in the use of the step as revealed at the time of trial would or would not do. Little evidence is before us which would aid the trier of the facts in determining just what kind of a step would or would not meet the reasonable expectations of the ordinary tractor driver as to its safety. Yet as seen from the charge, the jury was instructed only in language suitable to this second part of the bifurcated test. However, this is not a fatal defect in the evidence. See *Turner v. General Motors Corporation*, 514 S.W.2d 497 at 507 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n. r. e.).

Final uncertainty is noted in the balancing act concerning the suggested factors. As yet unanswered is any determination of how much the factors weigh so that it can be said with any reasonable determination just where the decision has ceased to be one for the Court and has become a fact issue for the jury.

Yet certain absolutes are said to exist in the field: (1) Strict liability cannot be equated to absolute liability. The step has to be dangerous to an extent beyond that which would be contemplated by the ordinary user with the ordinary knowledge

common to the community as to its characteristics. 2 Restatement of Torts 2d, Sec. 402A, Comment "i" (1965). (2) The manufacturer is not required or legally obligated to design the safest possible product, nor is he a guarantor that no harm will befall the user. *Henderson v. Ford Motor Company,* supra at 93; Prosser, Torts, 4th Ed. HB, Sec. 96 at p. 645 (1971). (3) Design alternatives, which would have prevented the accident, standing alone are insufficient to establish liability. *Weakley v. Fischbach & Moore, Inc.,* supra at 1267. (4) On the other side of the coin, the fact that the manufacturer of a product has been in conformity with a nationwide industry standard does not prevent a finding that the defect was unreasonably dangerous. *Turner v. General Motors,* supra.

Turning from generalities to the suggested factors, we find that the step was a simple device designed to stay on the tractor as long as the machine lasted regardless of the extreme conditions under which the machine operated. The alternative designs had been found to be unsatisfactory on track vehicles, although they were safer according to the Plaintiff's expert witness when one of many possible conditions was encountered—that is, mud; unsafer according to the Defendant's experts as potential finger-pinchers and clothing-catchers. Obviously, the alternatives were no-contest items when it came to the convenience to an operator whose job called for repeated use of the egress system during the day.

As to the likelihood of injury from the step, that was minimal. The Plaintiff admitted he had climbed off of the machine some 3,000 times, many times in the mud and with no injury. Two other operators testified that they had slipped off the step because of mud but with no harm. The step was only 22 inches from the ground and if one held on to the grab irons, there was no likelihood of injury from any slipping. This was verified by the Defendant's ten to fifteen years' experience with the same step where no field complaints were received.

Without equating voluntary assumption of the risk with strict liability, some matters usually associated with that defense become of primary importance in disposing of the threshold question of the manufacturer's liability. This step was a simple device where any risk arising from its use was open, obvious and known to anyone who used the machine. This Plaintiff did lean backward, he did see the step, he did place his foot on the step, and he did see the mud. This is not a question of assumption of risk where the subjective appreciation of danger by the Plaintiff is involved. The Plaintiff's actions and what was apparent to him are important in determining if the step was "in a defective condition unreasonably dangerous." This is determined by an objective test and not by the Plaintiff's subjective appreciation of danger. 2 Restatement of Torts 2d, Sec. 402A, Comment "i" (1965). As part of the Plaintiff's case, the Plaintiff was required to show that the condition which caused the injury was dangerous to an extent beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community. Any minimal danger presented by reason of the design of the step was open, obvious and objectively chargeable to the Plaintiff. *Morrow v. Trailmobile, Inc.,* 12 Ariz.App. 578, 473 P.2d 780 at 785 (1970).

Yet, the expert called by the Plaintiff testified that the step was unreasonably dangerous. But this is in an area where common experience and knowledge apart from expert testimony could determine that the step was not unreasonably dangerous, that is, it was not dangerous to an extent beyond that which would be contemplated by the ordinary consumer who used the step with the ordinary knowledge common in the community as to its characteristics. The expert used the step some twenty times. The Plaintiff used the step 3,000 times and very effectively said it was not dangerous. In this case, the opinion of the expert does not control over common experience and common sense. *General Motors Corporation v. Hopkins,* supra at 348.

When the Plaintiff saw the mud on the step, he could have held on to the grab irons and felt for the step—a matter of common knowledge. Thus, the shoe manufacturer was not liable for any design defect in the sole of the shoe which became slippery when wet—a condition common to almost all shoes when wet and commonly known. *Fanning v. LeMay*, 38 Ill.2d 209, 230 N.E.2d 182 (1967). Nor was a prima facie cause of action established where the Plaintiff fell while wearing new shoes, the condition of the soles being obvious and known to the Plaintiff. *Bennett v. International Shoe Company*, 275 Cal.App.2d 797, 80 Cal.Rptr. 318 (1969). A directed verdict for the manufacturer was upheld in the strict liability and negligent design case of *Askew v. Howard-Cooper Corporation*, 263 Or. 184, 502 P.2d 210 (1972). There, the operator slipped from his log-loading machine when servicing grease fittings. The Court pointed out that all of the fittings except two could have been serviced from the ground and that those two could have been reached from any solid place three feet high, and that the failure to equip the machine with ladders and rails with which to climb on the machine did not create a cause of action. See also *Morrow v. Trailmobile, Inc.,* supra; *Vincer v. Ester Williams All-Aluminum Swimming Pool Company*, 69 Wis.2d 326, 230 N.W.2d 794 (1975).

■ After testing the evidence under the "no evidence rule," we find that the Plaintiff has established some of the factors which have been discussed. However, after weighing those that were established against the undisputed evidence in this case, we hold that there was no testimony to establish the finding that the step in question was so designed as to be unreasonably dangerous. *Henderson v. Ford Motor Company*, supra at 94. To hold otherwise would be a step toward the establishment of jury-whim liability in the field of the design defect, the condition warned against in the Henderson article, "Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication," 73 Colum.L.Rev. 1531 at 1578 (1973).

We conclude that the step did not contain an unreasonably dangerous defect, and that as a matter of law it was as safe as it reasonably could be. The Defendant's "no evidence" point regarding the finding that the step was defectively designed is sustained.

We next come to the Defendant's attack on the jury's negligence finding. It is now generally recognized that in the improper design area, there is little difference between strict tort liability and negligence where the action is against the manufacturer. The proof in the negligence area is similar to that in strict liability under Section 402A where the plaintiff must establish "a defective condition unreasonably dangerous," which is merely negligence language in a strict liability setting. See Duvall, "Products Liability," 6 Tex.Tech.L.Rev. 1177 at 1180 (1975).

■ A manufacturer's duty of care with regard to the manufacture and design of his product in the negligence field is expressed in Sections 395 and 398 of 2 Restatement of Torts 2d (1965). Section 395 is the general provision and Section 398 is the rule's special application where the manufacturer of a chattel may be liable in negligence for its faulty design. The latter Section provides:

"A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

The "intended use" limitation has been held to be merely an adaptation of the test of foreseeability of the risk. *Otis Elevator Company v. Wood*, 436 S.W.2d 324 (Tex. 1968). We conclude that the evidence in this case does not make a case of negligence against the manufacturer regardless of the muddy conditions encountered. All the Plaintiff had to do was to firmly hold on to the grab irons. He would not have suffered harm even if his foot had slipped. No

latent defect was involved, and the use of the step created only a slight risk of harm that was known to the user. We hold that there was no evidence in the record that the manufacturer failed to exercise reasonable care in the adoption of a safe design. The Defendant's "no evidence" attack on the negligence finding is sustained.

We do not reach the Defendant's other points. The judgment of the Trial Court is reversed and is here rendered that the Plaintiff and intervenor take nothing.