**GENERAL MOTORS CORPORATION et al., Appellants,**

v.

**Robert A. TURNER, Appellee.**

**No. 8026.**

Court of Civil Appeals of Texas, Beaumont.

April 27, 1978.

Rehearing Denied June 1, 1978.

Raybourne Thompson, James B. Sales, Houston, for appellants.

Ronald Krist, Harvill E. Weller, Houston, for appellee.

KEITH, Justice.

Defendants below appeal from an adverse judgment rendered in a products lia-

bility suit involving the doctrine of "crash-worthiness" and we will designate the parties as they appeared in the trial court or by their descriptive names.

In an earlier venue appeal of this cause it was said:

"The question here is whether a manufacturer and retailer may be held strictly liable in tort for a defectively designed automobile which enhances the injuries of plaintiff, but does not cause the accident."

The court also held that the question presented was one of first impression. *Turner v. General Motors Corporation*, 514 S.W.2d 497, 499 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n. r. e.). We note that the court made an extensive statement of the underlying facts and we find no reason to recite again the events leading up to the wreck and the trial on the merits involving the doctrine of "crashworthiness."[1]

For the purposes of this opinion it is sufficient to state that plaintiff, while seeking to avoid a collision with a truck, overturned his car when it left the road. The car rolled over and the roof was deformed when it came in contact with the ground. Plaintiff received a crushed vertebra in the accident which resulted in his paralysis. It is not contended, and there is no evidence in the record that the design of the automobile or the roof thereof had any part in causing the accident which produced plaintiff's injuries.

The judgment which we review rests entirely upon a finding of strict liability in tort, the liability issue and accompanying instruction being set out in the margin.[2]

The jury found that the roof structure of the Chevrolet was defectively designed and that this was a producing cause of his injury. The third and final issue fixed the amount of plaintiff's damages. A joint and several judgment was entered against the two defendants, and dealer Kliesing was granted a judgment for full indemnity against General Motors. Both defendants have appealed urging a myriad of points of error, both substantive and procedural. We reverse and remand for the reasons now to be stated.

At the outset of our discussion, we pause to express our general agreement with this language found in *Self v. General Motors Corporation*, 42 Cal.App.3d 1, 7, 116 Cal. Rptr. 575, 579 (1974): "[P]rosecution of a lawsuit is a poor way to design a motor vehicle, for the suit will almost invariably emphasize a single aspect of design to the total exclusion of all others." Some argue that, "[a]s in the case of food and drugs, the imposition of safety standards on the automobile industry can most likely be achieved better by a consistent application of regulatory standards drawn up by experts and kept current by research, rather than by *ad hoc* decisions of inexpert judges and juries." J. O'Connell, "Taming the Automobile," *58 N.W.U.L.Rev. 299, 375 (1963)*, suggesting federal government regulation as the practical approach to the problem. But, we do not write upon a clean slate.[3]

### 1. The Charge

We are of the opinion that the definition of "unreasonably dangerous" used by

---

1. For several definitions of "crashworthiness," see *Dreisonstok v. Volkswagenwerk, A. G.*, 489 F.2d 1066, 1069, fn. 3 (4th Cir. 1974).
   See also, J. Sales and J. Perdue, "The Law of Strict Tort Liability in Texas," *14 Houston L.Rev. 1, 16–19 (1976–77)*.

2. *Special Issue No. 1*: "Do you find from a preponderance of the evidence that at the time the automobile in question was manufactured by General Motors the roof structure was defectively designed?
   "By the term 'defectively designed' as used in this issue is meant a design that is unreasonably dangerous.

" 'Unreasonably dangerous' means dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

3. P. Keeton, "Product Liability and Meaning of Defect," *5 St. Mary's L.J. 30, 36 (1973)*: "Trial judges cannot under the present state of the law be criticized for being unable to submit a product liability case to a jury in a satisfactory manner."

the court was erroneous. Plaintiff points out the obvious fact that it is in substantially the same language used by the court in *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 347, fn. 1 (Tex.1977). *Hopkins* and *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 92 (Tex.1974), both involved carburetors which were, according to the contentions of the plaintiffs, defectively designed; moreover, and more importantly, defects in the carburetors actually caused or contributed to cause the accident in each suit. Likewise, design of the step involved in *Caterpillar Tractor Co. v. Gonzales*, 562 S.W.2d 573 (Tex.Civ.App.—El Paso 1977, writ pending), was a producing cause of the injury of plaintiff. Assuming as we must the correctness and propriety of such an instruction where the defective design produces or contributes to causing the accident and consequent injury, we are of the opinion that such a charge is not proper in a crashworthiness case wherein the alleged defect had no part in causing the accident.

The trial court did not incorporate into the charge any of the suggested "balancing tests" mentioned in the venue appeal of this cause. And, it may be added, when only the reasonable expectation of the consumer test was submitted to the jury, in essence the jury was told that the doctrine of crashworthiness made the manufacturer an insurer; yet the *Turner Court* specifically noted that the application of the "balancing test" which it adopted would prevent the manufacturer from being held to be an insurer.

Even the leading case upon the subject, *Larsen v. General Motors Corp.*, 391 F.2d 495, 502 (8th Cir. 1968),[4] which was adopted in the venue appeal, holds:

"[A]n automobile manufacturer is under no duty to design an accident-proof or fool-proof vehicle or even one that floats on water, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision."

This concept is not to be found in the charge used in this case.

Although the balancing test suggested in *Turner* is somewhat difficult to articulate, under the specific holding in *Turner* the cause must be tried under a theory which "involves a traditional balancing of the gravity and likelihood of harm against the burden of precautions to avoid the harm. *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066 (4th Cir. 1974) (applying Virginia law)."[5] *Turner*, supra (514 S.W.2d at 504). We note at this point that *Turner* was not mentioned in either *Henderson* or *Hopkins.*

As indicated by the charge submitted, plaintiff carries all of his eggs in one basket—that his case is one governed by *Restatement of Torts (Second) § 402A (1965)* and maintains that he may prevail by a finding of the alternate consumer expectation test laid down in *Hopkins*, supra. In taking this position, plaintiff has ignored completely the thrust of the opinion in the venue appeal—the balancing tests mentioned therein.

Even a cursory examination of *Turner* reveals that the holding is not based solely upon the concept of strict liability under *§ 402A*, but the court relied heavily upon the common law concepts embraced in *Larsen* and *Dreisonstok.*

■ We are of the opinion that the terms "reasonable consumer" (and his expectations) and "prudent manufacturer" (and his awareness of risks) have no place in an instruction to the jury considering a crashworthiness case.[6] Each term has already

---

4. It should be noted that *Larsen*, supra, proceeds under the common law and specifically disavows reliance upon either strict liability in tort or implied warranty of merchantability for intended use. (391 F.2d at 506)

See in this connection M. Hoenig and C. Goetz, "A Rational Approach to 'Crashworthy' Automobiles: The Need for Judicial Responsibility," *6 SW.U.L.Rev. 1, 38, fn. 130 (1974).*

5. It has been said that *Dreisonstok* "applied a similar balancing test to a conscious design choice case under the negligence label." *Bowman v. General Motors Corp.*, 427 F.Supp. 234, 245, fn. 19 (E.D.Pa.1977).

6. See W. Donaher, et al., "The Technological Expert in Products Liability Litigation," *52 Tex. L.Rev. 1303, 1307 (1974)*, "It is time to abandon

acquired a fairly clear meaning in the ordinary strict liability case, i. e., those involving a product defectively *produced*. These terms, when we come to apply a balancing test—as we must do under *Turner, Larsen, Dreisonstok,* and *Huff*[7]—are purely subjective in nature and do not place before the jury the true elements making up either a cause of action or a defense thereto in a crashworthiness case.

We are of the opinion that the language found in J. Sales & J. Perdue, "The Law of Strict Tort Liability in Texas," *14 Houston L.Rev. 1, 13 (1976–77),* relying heavily upon the authors' analysis of language in *Rourke v. Garza,* 530 S.W.2d 794 (Tex.1975), and Dean Wade's law review article "Strict Tort Liability of Manufacturers," *19 SW.L.J. 5, 17 (1965),*[8] correctly enumerates some of the factors to be included in a charge to be used in such cases as the one now under review. We quote:

> "The court [in *Rourke v. Garza,* supra] reduced the issue of defective design to a determination of whether the boards were unreasonably dangerous. In ascertaining whether the scaffolding was

unreasonably dangerous, a balancing of the risk of harm against the utility of the product as designed was determinative. In judging the utility of the product, consideration of a number of factors was important. These factors included the burden imposed on the manufacturer to change the design, the expense of the change, and the effect on the usefulness of the product by the change in design."

█ The authors then list the seven factors posited by Dean Wade in his law review article noted above.[9] While we are in accord with all of Dean Wade's balancing factors, *as applied to a defectively manufactured product,* we are unwilling to accept the entire list when considering a crashworthiness case involving an automobile.[10]

Dean Wade prefaces his list of seven balancing factors with this sentence: "We have here again the problem of balancing the utility of the risk ·against the magnitude of the risk. Factors involved . . . include . . . (1) the usefulness and desirability of the product . . . ." When we consider an automobile, we must realize

---

the perspective of the reasonable consumer and the reasonable seller and formulate the strict liability question for what it is. . . . The unreasonable danger question, then, is posed in terms of whether, given the risks and benefits of and possible alternatives to the product, we as a society will live with it in its existing state or will require an altered, less dangerous form." *Query:* Is this truly the formulation of a "strict liability question for what it is"?

7. *Huff* refers to *Huff v. White Motor Corporation,* 565 F.2d 104 (7th Cir. 1977), which specifically overruled that court's earlier and well-known opinion in *Evans v. General Motors Corp.,* 359 F.2d 822 (7th Cir. 1966). *Huff* has an appendix citing cases following *Larsen*—a distinctively greater number than those following its discarded *Evans* holding.

8. This same law review article was cited by Justice Reavley in the much-cited footnote 1 in *Hopkins,* supra, and in *Rourke v. Garza,* supra, at 799.

9. Dean Wade's balancing factors are: "(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (par-

ticularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." (19 SW.L.J. at 17)

10. Dean Keeton has presented a four-pronged balancing test. See "Manufacturer's Liability: The Meaning of 'Defect' in the Manufacture and Design of Products," *20 Syracuse L.Rev. 559, 565 (1969):* "In order to justify a finding of negligence for the way a product was designed there must be proof to support the following findings: (1) that there was in fact an appreciable danger from some condition, ingredient, or component of the product; (2) that it was a known or scientifically knowable fact at the time of sale that harm could result from a condition or an ingredient of the product; (3) that the maker realized or should have realized in the exercise of ordinary care the dangers involved in the product's use; and (4) that a ordinary man would have concluded that the magnitude of the discoverable danger outweighed the benefits of the product, at least in the absence of more satisfactory instructions or information."

that its utility cannot be balanced with any alternative form of transportation available for the myriad of uses to which an automobile is adapted.

To adopt this first test of Dean Wade as one of the factors would mean that if a reasonable consumer had the information available to weigh accurately the risk of harm from the use of the automobile against the utility of its use, he might find the risk so great that he would stop using the car rather than take the risk. Few of us would walk or ride bicycles because of a known risk in using our own automobile.

Rather, we should consider how a changed design of the automobile would affect the admittedly high utility of the automobile.[11]

■ We are of the opinion that the following factors should be balanced, as directed by *Turner,* in making the determination of whether the design is or is not defective: (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product,[12] or of the existence of suitable warnings or instructions. See generally, *Huddell v. Levin,* 537 F.2d 726 (3rd Cir. 1976) [commented upon in *7 Cumberland L.Rev. 577 (1977)*]; *Seattle-First National Bank v. Tabert,* 86 Wash.2d 145, 542 P.2d 774, 779 (1975); *Ross v. Up-Right, Inc.,* 402 F.2d 943 (5th Cir. 1968), applying Texas law; *Bowman v. General Motors Corp.,* 427 F.Supp. 234, 243–244 (E.D.Pa.1977); J. Wade, "On the Nature of Strict Tort Liability for Products," *44 Miss.L.J. 825, 837–838 (1973),* quoted in *Bowman,* at 244–245, fn. 18.[13]

### 2. Evidentiary Points

■ General Motors contends that the trial court erred in excluding evidence of the Federal Motor Vehicle Safety Standard No. 216 pertaining to federal requirements of strength of roof structures.[14]

In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act, *15 U.S.C.A. § 1381, et seq. (1974).* Pursuant to this Act, the National Highway Traffic Safety Administration (NHTSA), an agency of the Department of Transportation, issued Standard No. 216, effective for passenger vehicles manufactured after September 1, 1973. This standard requires all passenger vehicle roofs to bear 5,000 pounds of load, or one and one-half times the vehicle's weight, whichever is less. Plaintiff's vehicle passed the test at 13,000 pounds of pres-

---

11. Perhaps, if every automobile were to be equipped with a governor limiting its speed to 20 miles per hour, *all* cars and *all* users would be safer. But, the incremental effect on the utility of the automobile would be so great as to render the car virtually unusable in most situations. Similarly, a Sherman tank structure could be adapted to an automobile but few would care to use it to go to the grocery store or the drive-in movie. The examples could be multiplied with ease.

12. The purchaser of a topless convertible automobile should be charged with knowledge that if he overturns the car he may be injured. On the other hand, he may not know if the roof structure of a sedan model is of sufficient strength to withstand a similar rollover. *Chrysler Corporation v. Department of Transportation,* 472 F.2d 659, 679 (6th Cir. 1972).

See Comments, "*Dreisenstock v. Volkswagenwerk, A.G.*: Manufacturer Liability for Second Collision Design Defects," *5 Golden Gate L.Rev. 161, 168 (1974).*

13. See also J. Henderson, "Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication," 73 Columbia L.Rev. 1531, 1540 (1973): " 'How much product safety is enough?' . . . can only be provided by a process that considers such factors as market price, functional utility, and aesthetics, as well as safety, and achieves the proper balance among them."

14. This discussion of the second and third complaints was prepared by Chief Justice Dies to whom the cause was assigned originally and is adopted as a part of this opinion.

sure, or over two and one-half times this level.

The trial court refused to allow defendant's counsel to refer to this as a "federal standard," requiring that it be referred to as a "practice of the industry."

The *Restatement of Torts (Second) § 402A (1965)* provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused . . . .."

This doctrine was adopted as Texas law by our Supreme Court in *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787 (Tex.1967). Our Supreme Court held in *Henderson v. Ford Motor Company,* supra (519 S.W.2d at 92), that "[t]he car manufacturer and its dealer are liable for unreasonably dangerous products—whether designed defectively or improperly and produced as designed, or whether designed perfectly but improperly or defectively produced."

There is no contention in our case that the proof involved was not produced as it was designed. It was then plaintiff's burden to establish that the roof design was unreasonably dangerous. Plaintiff produced two witnesses, both with an automotive design background, who concluded that the design of the roof of plaintiff's automobile was unreasonably dangerous. They suggested an alternative design consisting of three roll bars extending from the frame of the car over the roof area. They admitted that no other sedan passenger car made anywhere in the world employed this design.

■ In their defense, the manufacturer and the dealer offered the federal standard above set out. Plaintiff argues that since the standard was admitted, it was immaterial that the trial court refused to identify its source. We disagree. The jury must know the source of a standard in order to evaluate its weight. In *Pyatt v. Engel Equipment, Inc.,* 17 Ill.App.3d 1070, 309 N.E.2d 225 (3rd Dist.1974), plaintiff sought damages for injuries from a manufacturer of an alleged defectively designed machine.

The court held it error for the trial judge not to identify the source of relevant safety rules promulgated by the Industrial Commission of Illinois, saying:

"The appellee suggests that whatever prejudice might have ensued because of any error in the admission of the Health and Safety Rules was cured by this course of action [admitting the standard but excluding its source]. We do not share this view, since it would be of substantial relevance in evaluating a standard to know the source of the standard as distinguished from the opinion of a single expert." (309 N.E.2d 227)

See also *Cresap v. Pacific Inland Navigation Co.,* 78 Wash.2d 563, 478 P.2d 223 (1970); *Provenza v. American Export Lines, Inc.,* 324 F.2d 660 (4th Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971 (1964).

The Fifth Circuit, in what has been described as "[o]ne of the most far-reaching decisions on the subject," [15] *Muncie Aviation Corporation v. Party Doll Fleet, Inc.,* 519 F.2d 1178, 1181–1183 (5th Cir. 1975), considered the subject in depth and concluded that two advisory circulars promulgated by the Federal Aviation Administration were properly admitted in evidence "though merely advisory and without the force or effect of law." (Id. at 1180) The Court continued:

"Their trustworthiness is guaranteed by the fact that they were recently published by a governmental agency whose only conceivable interest was in insuring safety and whose recommendations 'should have the highest probative value regarding national, state, or local practices.'" (Id. at 1182)

■ It is obvious a jury could attach less weight to a standard whose origin was of the industry itself rather than federal law. Texas law is liberal in the admission of evidence as "relevant and material if it tends to prove, or disprove, any material fact involved in the issue or the question being tried." *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681, 699–700 (1941).

15. See W. Rambin, "Consumer Product Safety," *30 Baylor L.Rev. 115, 125 (1978).*

Plaintiff cites *Simms v. Southwest Texas Methodist Hospital,* 535 S.W.2d 192 (Tex. Civ.App.—San Antonio 1976, writ ref'd n. r. e.), for the proposition that a federal regulation enacted subsequent to plaintiff's injury is not admissible. That case is distinguishable readily. There, plaintiff sued a surgical gloves' manufacturer, claiming that the cornstarch powder it put on its surgical gloves caused "starch granuloma" when plaintiff was operated on by a doctor wearing the gloves. The trial court refused to permit plaintiff to introduce into evidence a regulation promulgated by the Federal Drug Administration subsequent to her injury requiring that packages containing surgical gloves, which had been sprayed with starch, bear a warning statement and instructions for removing the powder.

On appeal, plaintiff relied only on breach of the implied warranty of merchantability, contending that defendant's failure to give warning and instructions rendered the gloves unreasonably dangerous and, therefore, unfit for the ordinary purposes for which such gloves are used. *Tex.Bus. & Comm. Code Ann. § 2.314(b)· (1968).* The jury failed to find that such dangerous condition was a producing cause of plaintiff's injuries. The court held that plaintiff had the burden of proving the defect was a producing cause of her injury.

Concerning the federal rule, the court had this to say:

"The only case cited by plaintiff concerning the admissibility of a rule adopted by a regulatory agency subsequent to the injury of which plaintiff complains is *Curtis v. District of Columbia,* 124 U.S. App.D.C. 241, 363 F.2d 973 (1966). In that case plaintiff was injured when he tripped over the hinge of .a vault which protruded above the surface of a public sidewalk. It was held that evidence of a subsequently adopted building code regulation, requiring that such hinges be constructed so as to be flush with the pavement was admissible as evidence of negligence, since it constitutes a standard of care against which the jury could measure the defendant's conduct.

"*Curtis* clearly did not involve the question of admissibility of a governmental regulation which defendant has violated, since the regulation there in question was not in force at the time of the accident. The same is true here. The actual holding in *Curtis,* therefore, is that a governmental regulation which defendant has not violated is nevertheless admissible as some evidence of the standard of care in a sufficiently analogous situation." (535 S.W.2d at 200)

Plaintiff also cites *Bell v. Buddies Super-Market,* 516 S.W.2d 447 (Tex.Civ.App.—Tyler 1974, writ ref'd n. r. e.), a negligence case brought by a customer who fell on the store's ramp. The trial court excluded certain safety standards promulgated for the construction of ramps. These were promulgated after plaintiff's injury. The exclusion was upheld.

■■■ Negligence in Texas requires proof of foreseeability as an element of proximate cause. *East Texas Motor Freight Lines v. Loftis,* 148 Tex. 242, 223 S.W.2d 613 (1949); *Clark v. Waggoner,* 452 S.W.2d 437 (Tex.1970). Strict liability under *Restatement of Torts (Second) § 402A* requires no showing of negligence. See P. Keeton, "Manufacturer's Liability: The Meaning of 'Defect' in the Manufacture and Design of Products," *20 Syracuse L.Rev. 559 (1969).* The controlling issue in the crashworthiness inquiry is not foreseeability, but intended use. *Turner,* supra (514 S.W.2d at 503).

■■■ Subsequently enacted standards should be admissible in cases of strict liability so long ‾as they fairly reflect standards existing during the relevant time period. See Nader & Page, "Automobile Design and the Judicial Process," *55 Calif.L.Rev. 645, 669–670 (1967),* cited in venue appeal of *Turner,* supra. In our case all expert witnesses agree the "state of the art" had not appreciably changed between the manufacture of the roof involved and issuance of Federal Standard No. 216. We sustain this point of error of defendant General Motors.

■■■ We turn now to a third complaint of the defendants, that relating to the exclusion of evidence of a test conducted by a

witness for the defendants. After plaintiff's witnesses had testified about the safety of the roll bars, as noted in our discussion of the second complaint, the defendants hired a racing car mechanic to install a NASCAR roll cage system on a car that was the same make and model as plaintiff's vehicle. A NASCAR roll cage is one that is used on racing cars. Then the car was mounted on its side on a dolly, roof in front, and crashed into a stationary barrier at 30 m. p. h. (A film of this was shown this court at oral argument.) The trial court correctly excluded evidence of this experiment.

The admissibility of out-of-court experiments depends on the particular facts and circumstances of each case. The experiment must be objective and not mislead or confuse the jury. *Fort Worth & Denver Railway Co. v. Williams*, 375 S.W.2d 279, 282 (Tex.1964); *Van Ornum v. Otter Tail Power Co.*, 210 N.W.2d 188, 197 (1973). The evidence shows here that the forces involved in a rollover and a barrier crash test are not the same; they are much greater in the barrier crash, and much more likely to damage the roof. It would not be fair to admit this experiment, because it was totally different from our rollover situation. See *Kirk v. Bennett*, 456 S.W.2d 191 (Tex. Civ.App.—Waco 1970, writ ref'd n. r. e.). Nor was this experiment admissible to impeach plaintiff's expert witnesses. Defendants' questions to the witnesses regarding barrier crashes were ambiguous and did not clearly indicate what type of experiment was to be conducted.

Each of the defendants has a series of points attacking the legal and factual sufficiency of the evidence to support the answers to Special Issues One and Two—a defectively designed roof structure which was a producing cause of plaintiff's injuries. Reduced to the simplest terms, the common base of each of the complaints is that plaintiff's expert witnesses, Barron and Marcosky, were not qualified as expert witnesses and that the trial court erred in permitting each to express his opinion that the design of the automobile rendered it unreasonably dangerous; consequently, when such evidence is removed from the record, there is no competent evidence to support the findings. We disagree and overrule all of such points of error, making application of the rule in *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965), in passing upon the points relating to the legal and factual sufficiency of the evidence to support the findings.

On the prior venue appeal, Barron's qualifications and the substance of his testimony is set out at some length (514 S.W.2d at 499–500) and similar testimony was introduced upon the trial, although in greater detail. We see no need to reproduce the testimony previously summarized.

Marcosky, the other expert witness tendered by plaintiff, was a graduate mechanical engineer who had been employed for several years by General Motors as a design engineer. While his qualifications and experience in the field may not have been quite as impressive or extensive as those shown by Barron, nevertheless, the trial court committed no error in permitting his testimony to be introduced.

Moreover, we find no tenable objection in our record attacking the qualification of either of the witnesses. It is trite learning that whether a person tendered as an expert possesses the required qualification is a preliminary question for determination by the trial judge subject to review for an abuse of discretion. See, generally, *2 C. McCormick & R. Ray Texas Law of Evidence § 1401, at 235 (2d ed. 1956)*.

Defendants' attack upon the testimony of Barron and Marcosky goes to the weight and not to the admissibility of their testimony. We find no error in the admission of such opinion evidence.

Moreover, after a review of such testimony, we disagree with defendants—Barron and Marcosky did more than offer criticism of the design of the Chevrolet automobile. Their testimony constitutes "more than a mere scintilla, surmise or suspicion of the existence of a design defect." Cf. *Henderson v. Ford Motor Co.*, supra, 519 S.W.2d at 99. Defendants' points attacking the qualifications of the witnesses and the legal and factual sufficiency of the evidence are overruled.

Next, the defendants contend that the trial court erred in refusing to submit to the jury a specially requested instruction to the effect that their award of damages was not subject to federal taxation.[16] The parties recognize that such an instruction was held to be improper in *Missouri-Kansas-Texas Railroad Co. v. McFerrin*, 156 Tex. 69, 291 S.W.2d 931, 945 (1956), because "[i]t introduces a wholly collateral matter into the damage issue," and the rule has not been relaxed by our Supreme Court.[17]

Defendants have many more points which we have examined and find to be without merit and each is overruled. For the errors herein pointed out, the judgment of the trial court is reversed and the cause is remanded.

REVERSED and REMANDED.

KEITH, Justice, dissenting.

*Charge on Federal Taxation of Award*

I disagree with my brethren on the trial court's action in refusing defendants' charge that the award of damages was not subject to federal taxation. I readily admit, as I must, that under the decision in *McFerrin*, 156 Tex. 69, 291 S.W.2d 931, 945, the refusal was proper. But, in this era of increasingly large verdicts, the rationale of *McFerrin* is difficult to understand and even more difficult to support. The theory underlying the tort reparations system is that the injured party should be awarded compensation which would place him in the financial position he would have occupied but for the negligence of the opposite party. In arriving at this figure, our courts consistently permit the reception of expert opinion evidence as to the effect of future inflation upon the earning capacity of the injured party, the rate of interest in the future, and other factors having a bearing upon the award.

I submit that it is unrealistic in this day and time when every employed person is acutely conscious of the tax consequences of every economic fact of life. As stated by Kliesing's counsel:

"The universal application of the federal income tax pervades the lives and consciousness of all citizens who occupy the jury box. . . . In order to dispel any misapprehension and to avoid any confusion that may affect jurors attempting to award damages, a simple and uncomplicated instruction that any award made to the plaintiff is not subject to federal income taxation is mandatory."

The Ninth Circuit accepted a similar argument. See *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 295–297 (9th Cir. 1975). See also *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1251 (3rd Cir. 1971), cert. denied, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971); *Turcotte v. Ford Motor Co.*, 494 F.2d 173 (1st Cir. 1974).

In the years following the *McFerrin* pronouncement on the taxation/instruction, *McFerrin* has been examined and reexamined by our Supreme Court and its basic holding (as to Tex.Rev.Civ.Stat.Ann. art. 6701d, § 86) has been repudiated.[*]

I respectfully suggest that it would be appropriate for our Supreme Court to reexamine and to change its holding with reference to the instruction now under discussion. I do so in the form of a dissent so as to confer jurisdiction to determine such question under the provisions of *Tex.Rev.Civ.Stat.Ann. art. 1728, subdiv. 1 (1962)*. Regardless of other errors which have been mentioned in the foregoing opinion, I would

16. Kliesing's request read: "You are instructed that any sum of money you may award as damages will not be subject to federal income tax."

17. *McFerrin* has been followed consistently and as recently as 1977 in *St. Louis Southwestern Ry. Co. v. Greene*, 552 S.W.2d 880, 884 (Tex. Civ.App.—Texarkana 1977, no writ).

My two colleagues are in agreement that the trial court properly refused the requested instruction relating to federal income taxation; but I disagree with this ruling based as it is on *McFerrin*, supra, for the reasons set out hereinafter. My colleagues have kindly consented for me to express my views in the form of a dissenting opinion on this question.

* See, e. g., *Christy v. Blades*, 448 S.W.2d 107 (Tex.1969) and *Southern Pacific Company v. Castro*, 493 S.W.2d 491 (Tex.1973).

find reversible error in the refusal of the requested charge on federal taxation of the damage award.

### Purchaser's Duty in Using Product

In preparing the opinion for the majority, I concluded that there were five balancing factors to be utilized in the determination of whether the design is or is not defective. Only four of such factors are found in the majority opinion for the reason that one did not meet with the approval of a majority of the Court. Such factor, as it was formulated by me read: "The user's ability to avoid danger by the exercise of ordinary care in the use of the product."

It was removed because the majority was of the opinion that this injected an element of contributory negligence into the case.

I disagree. The omitted element closely follows and was based, at least in part, upon Dean Wade's sixth element (see majority opinion, footnote 9, quoting from *19 SW.L.J. at 17*). Dean Wade's element No. 6: "the avoidability of injury by care in use of the product (including the effect of instructions or warnings)."

I submit that a "balancing test" which deliberately and intentionally excuses the user of a product from the exercise of ordinary care while using a product is deficient; indeed, my concept is more favorable to the user than that of Dean Wade's quoted earlier.

I am of the opinion that the balancing test should require the use of ordinary care by the purchaser while using the product.