Robert A. TURNER, Petitioner,

v.

GENERAL MOTORS CORPORATION et al., Respondents.

No. B–7747.

Supreme Court of Texas.

June 13, 1979.

Rehearing Denied July 18, 1979.

Thomas M. Reavley, Austin, Krist, Gunn, Weller & Neumann, Ronald D. Krist and Harvill E. Weller, Jr., Houston, for petitioner.

Vinson & Elkins, Raybourne Thompson, Jr. and Jack C. Nickens, McAninch, Coppock & Teltschik, Fulbright & Jaworski, James B. Sales and Robert A. Macinnes, Houston, for respondents.

ON MOTIONS FOR REHEARING

STEAKLEY, Justice.

The opinion of the Court delivered March 21, 1979, and the judgment based thereon, are withdrawn. The following is now the opinion of the Court.

Robert A. Turner overturned his 1969 Chevrolet Impala sedan, manufactured and sold by General Motors Corporation, while

seeking to avoid a collision with a truck. The car rolled over once and the roof caved in at the driver's corner when it contacted the ground. Although his seat belt was buckled, Turner was struck on his head and suffered a crushed vertebra resulting in paralysis. It is not contended that the design of the automobile or the roof had any part in causing the accident.

Turner sued General Motors and the dealer, Kliesing Motor Company, in a products liability action on a strict tort liability theory, alleging the uncrashworthiness of the automobile. General Motors did not interplead the driver or owner of the truck. In a venue appeal it was ruled that under this doctrine a manufacturer and retailer may be held strictly liable in tort for a defectively designed automobile which enhances the injuries of the plaintiff but does not cause the accident. *Turner v. General Motors Corp.*, 514 S.W.2d 497 (Tex.Civ.App.1974, writ ref'd n. r. e.).

Upon the subsequent trial of the merits of Turner's action now before us the jury answered the following issue in the affirmative:

## SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that at the time the automobile in question was manufactured by General Motors the roof structure was defectively designed?

By the term "defectively designed" as used in this issue is meant a design that is unreasonably dangerous.

"Unreasonably dangerous" means dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

The jury similarly answered the producing cause issue and in response to the issue on damages assessed the sum of $1,140,000.

The trial court judgment for Turner was reversed by the Court of Civil Appeals and the cause remanded. 567 S.W.2d 812. After stating that the definition of "unreasonably dangerous" given the jury by the trial court was in substantially the same language used in *General Motors Corp. v. Hopkins*, 548 S.W.2d 344 (Tex.1977), the Court of Civil Appeals ruled that this was not proper in a crashworthiness case and that the jury should be instructed to balance specific factors in determining whether or not the design causing the injury was defective:

We are of the opinion that the following factors should be balanced, as directed by *Turner*, in making the determination of whether the design is or is not defective: (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

567 S.W.2d at 818.

The court also ruled that the trial court erred in excluding evidence that an industry practice or standard for roof strength, offered by General Motors and admitted into evidence, was subsequently embodied in Federal Motor Vehicle Safety Standard No. 216. The standard was promulgated in December, 1971, by the National Highway Traffic Safety Administration and became effective on September 1, 1973. The car in question was purchased in 1969 and the accident occurred in April, 1971.

Turner applied for and was granted writ of error to review these rulings of the intermediate court. General Motors in its reply asserted (a) that the trial court also erred in its definition of unreasonably dangerous by not requiring that consumer expectations be reasonable, and in refusing the alternate

prudent manufacturer standard; (b) that a balancing factor instruction in specific respects required by the Court of Civil Appeals is essential in a conscious design crashworthiness case, as here, in distinction to cases where the defect is alleged to have caused the accident as well as the resulting injury; and (c) that the only authoritative standard for roof strength was the one subsequently adopted by the federal government and the jury was entitled to know both the standard itself, and its source.

General Motors and Kliesing Motor Company filed conditional applications for writ which were also granted. Certain of their points will be summarized because of their relevance to the discussion and rulings immediately to follow; others will be noted thereafter. It is argued that conscious design cases should be more properly conceived as negligence or engineering malpractice cases with the existence of a defective design dependent upon the reasonableness of the manufacturer's action and the due care that was exercised; the fact finders should be required to evaluate the conduct of the manufacturer and not to evaluate the product itself; and that conscious design cases in crashworthiness contexts are different in principle from all other conscious design cases where the alleged defect caused the accident.

We will reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court. In doing so we reaffirm the application of the principles of strict liability to suits based on conscious design defects in products entering the channels of commerce. We further hold:

1. The rules of strict liability govern in cases where the defect caused the accident and the resulting injuries, and in crashworthiness cases where the defect is the cause of injuries only. Evidence upon the factors of risk and utility such as those enumerated by the Court of Civil Appeals, as well as upon the expectations of the ordinary consumer, may be admissible in the trial of such cases. As to this, however, we disapprove the holding of the Court of Civil Appeals that the jury is to be instructed to balance specifically enumerated factors, whether those listed by the Court of Civil Appeals, or otherwise.

2. The definition of "unreasonably dangerous" given by the trial court is consistent with our previous writings in *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex. 1974) and *General Motors Corp. v. Hopkins*, 548 S.W.2d 344 (Tex.1977). See also *Signal Oil & Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978); *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex. 1978); *Miller v. Bock Laundry Machine Co.*, 568 S.W.2d 648 (Tex.1977); and *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975).

3. Upon re-examination of these previous writings we have determined that henceforth in the trial of strict liability cases involving design defects the issue and accompanying instruction will not include either the element of the ordinary consumer or of the prudent manufacturer; to the extent of any conflict in such respects, *Henderson* and *Hopkins* are overruled. The jury may be instructed in general terms to consider the utility of the product and the risks involved in its use.[1]

*The Crashworthiness Doctrine*

The concept of defect is central to a products liability action brought on a strict tort liability theory, whether the defect be in conscious design, or in the manufacture of the product, or in the marketing of the product. See, *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex.1974); *Darryl v. Ford Motor Co.*, 440 S.W.2d 630 (Tex.1969);

---

1.          SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that at the time the [product] in question was manufactured by [the manufacturer] the [product] was defectively designed?

By the term "defectively designed" as used in this issue is meant a product that is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.
Answer: "We do" or "We do not."

*McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787 (Tex.1967).[2]

Citing *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787 (Tex.1967), we wrote in *Pittsburg Coca-Cola Bottling Works of Pittsburg v. Ponder,* 443 S.W.2d 546 (Tex. 1969), of our final yield to the irrefutable logic that the rule of strict liability is the only practical vehicle for protecting the public against harm caused by defective products. We recognized that *McKisson* committed the Court to the rule of strict liability expressed in Section 402A of The American Law Institute's Restatement of the Law of Torts (2d Ed.). We wrote further:

> The prime requirement for imposing liability on a seller under the rule of strict liability is proof by the plaintiff that he was injured because of a defective condition in the product when it left the hands of the particular seller. *Jack Roach-Bissonet, Inc. v. Puskar,* 417 S.W.2d 262, at 278 (Tex.1967). This is not to say that proof of the defect must be made by direct or opinion evidence; it usually can only be made by circumstantial evidence. As an example, see *Darryl v. Ford Motor Co.,* [440 S.W.2d 630 (Tex. 1969)].

443 S.W.2d at 548.

Later, in *Henderson v. Ford Motor Co.,* 519 S.W.2d 87, at 92, we wrote:

> The car manufacturer and its dealer are liable for unreasonably dangerous products—whether designed defectively or improperly and produced as designed, or whether designed perfectly but improperly or defectively produced.

A logical extension of the rationale of these decisions is succinctly stated in *Huff v. White Motor Corp.,* 565 F.2d 104, 109 (7th Cir. 1977):

> One who is injured as a result of a mechanical defect in a motor vehicle should be protected under the doctrine of strict liability even though the defect was not the cause of the collision which precipitated the injury. There is no rational basis for limiting the manufacturer's liability to those instances where a structural defect has caused the collision and resulting injury. This is so because even if a collision is not caused by a structural defect, a collision may precipitate the malfunction of a defective part and cause injury. In that circumstance the collision, the defect, and the injury are interdependent and should be viewed as a combined event. Such an event is the foreseeable risk that a manufacturer should assume.

■ In each case, i. e., where the product causes the accident and resulting injuries and where the product causes damage or injury only, the causative defect is one of conscious design and there is no valid distinction in strict liability between a conscious design defect causing an accident and a conscious design defect causing an injury. By the same token, there is no rational basis for a difference in the manner of submission of the issues to be determined by the fact finder. We have not required a balancing of enumerated factors in jury submission by our previous writings, and, as stated earlier, we disapprove the ruling of the Court of Civil Appeals that such is required in a crashworthiness case.

---

2. There is much literature upon the question of actionable defect. See RESTATEMENT (SECOND) OF TORTS § 402A (1965); *Products Liability: How Good Does A Product Have to Be?,* 42 Ind.L.J. 301 (1967); Fischer, *Products Liability—The Meaning of Defect,* 39 Mo.L.Rev. 339 (1974); Keeton, *Manufacturer's Liability: The Meaning of "Defect" In The Manufacture And Design of Products,* 20 Syracuse L.Rev. 559 (1969); Keeton, *Product Liability And The Meaning of Defect,* 5 St. Mary's L.J. 30 (1973); Keeton, *Products Liability—Liability Without Fault And The Requirement of A Defect,* 41 Tex.L.Rev. 855 (1963); Montgomery & Owen, *Reflections on The Theory and Administration of Strict Tort Liability for Defective Products,* 27 S.C.L.Rev. 803 (1976); Sales & Perdue, *The Law of Strict Tort Liability in Texas,* 14 Hous.L.Rev. 1 (1976–77); Traynor, *The Ways and Meanings of Defective Products and Strict Liability,* 32 Tenn.L.Rev. 363 (1965); Wade, *On The Nature of Strict Tort Liability For Products,* 44 Miss.L.J. 825 (1973); L. Frumer & M. Friedman, 2 Products Liability, § 16A (1970).

The difficulty of formulating a series of specific factors which the fact finders will be instructed to balance is obvious. The majority of the Court of Civil Appeals enumerated four factors it would require to be balanced in determining the fact issue of defective design; the dissenting justice would require a fifth factor. These suggested factors were apparently derived from two cited law review articles: that of Dean Wade, *Strict Tort Liability of Manufacturers*, 19 Sw.L.J. 5, 17 (1965) suggesting seven factors; and that of Dean Keeton, *Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products*, 20 Syracuse L.Rev. 559, 565 (1969), suggesting four factors. Dean Wade, in a later article, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 838, 840 (1973), offered a revised list of seven factors which seemed to him to be of significance in applying the unreasonably dangerous standard. He posed the question of how the proposed standards are actually to be used in the trial of a case and wrote that "It is here [unsafe design] that the policy issues become very important, and the factors which were enumerated above must be collected and carefully weighed. It is here that the court—whether trial or appellate—does consider these issues in deciding whether to submit the case to the jury. . . . Should the jury be told about the list of seven factors which were set forth above? The answer should normally be 'no.'" His conclusion is that the analysis is most helpful and can be used by appellate and trial judges, and by students and commentators, but that it is not normally given to the jury. Many other commentators have suggested factors to be utilized. See, Dickerson, *Products Liability: How Good Does A Product Have To Be?*, 42 Ind.L.J. 301, 331 (1967) (five factors); Fischer, *Products Liability—The Meaning of Defect*, 39 Mo.L.Rev. 339, 359 (1974) (fifteen factors); Montgomery & Owen, *Reflections On The Theory And Administration of Strict Tort Liability For Defective Products*, 27 S.C.L.Rev. 803, 818 (1976) (four factors); Shapo, *A Representational Theory of Consumer Protection: Doctrine, Func-* *tion and Legal Liability for Product Disappointment*, 60 Va.L.Rev. 1109, 1370–71 (1974) (thirteen factors).

In speaking to the question of whether there was evidence to support the jury finding that the product was unreasonably dangerous, we wrote in *Rourke v. Garza*, 530 S.W.2d 794, 799 (Tex.1975): "Thus, the jury was justified in concluding that the risk of harm outweighed the utility of the cleatless scaffold boards and that they were therefore unreasonably dangerous." There was no suggestion in *Rourke*, however, that the jury should have been instructed to balance specific factors of risk of harm against utility.

It has been pointed out that the evidence necessary to address the appropriate elements of balancing criteria should be overtly advanced by both parties in a strict liability action; but that this does not necessarily lead to the conclusion that the jury should be specifically instructed concerning these considerations. See, Donaher, Piehler, Twerski and Weinstein, *The Technological Expert in Products Liability Litigation*, 52 Tex.L.Rev. 1303, 1307–08 (1974). See also, Green, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation*, 54 Tex.L.Rev. 1185, 1203–06 (1976).

### The Charge to the Jury

We turn now to the attack of General Motors and Kliesing on the definition of "unreasonably dangerous" contained in the charge to the jury. As quoted earlier, the trial court defined the term "unreasonably dangerous" as follows:

"Unreasonably dangerous" means dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

One objection of General Motors to this definition, and its request for a substitute, is recorded in the trial record as follows:

The defendant General Motors likewise objects to the submission of Special Issue No. 1 because it is an incorrect submission

**850**

of the law pertaining to the design defect which is before the court in Turner vs. General Motors Corporation and Kliesing Motor Company.

The special issue incorrectly defines the term unreasonably dangerous.

At this time the defendant General Motors Corporation would request that the court correctly define unreasonably dangerous to include the following definition: "Unreasonably dangerous means dangerous to the extent that any automobile so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks involved in its use or to the extent that the automobile would not meet the reasonable expectations as to safety of the ordinary consumer with the ordinary knowledge common to the community as to its characteristics."

And at this time, in reference to our objection to Special Issue No. 1 and the definition of unreasonably dangerous the defendant General Motors Corporation would tender its requested special issue, which contains the correct definition of unreasonably dangerous.

This special issue tendered to the court is marked Special Issue No. 1, and is hereby tendered to the court and has been marked refused by his honor.

The writings of this Court in *Henderson* and *Hopkins* do not require the disjunctive definition of "unreasonably dangerous" requested by General Motors. The stated concept of *Henderson* and *Hopkins* was that the additional perspective of the prudent manufacturer is to the advantage and for the benefit of an injured plaintiff and is available to him if under the facts the defect is apparent, or if it is felt that the fact finders might be diverted by the lack of expectations of the consumer with regard to the details of product design.

The bifurcated test instructs the jury that the product is unreasonably dangerous (1) if the product threatens harm to persons using the automobile to the extent that any automobile so designed would not be placed in the channels of commerce by a prudent

manufacturer aware of the risk involved in its use *or* (2) to the extent that the automobile would not meet the reasonable expectations of the ordinary consumer as to its safety. The use of the alternative test was made clear in *Hopkins*. The trial court had submitted the *Henderson* test except for the use of "and" in lieu of "or." This error was pointed out in a footnote wherein it was said in part:

The use of 'and' here emphasized is of no consequence in the present case, but the proper definition would be disjunctive—using 'or' rather than 'and.'

548 S.W.2d 347–348.

Although we have never expressly considered a point of error complaining of the use of only one part of the bifurcated or disjunctive test, we have affirmed, without a suggestion of disapproval, several cases where the trial court gave the jury only the RESTATEMENT (SECOND) OF TORTS § 402A, comment (i) definition of "unreasonably dangerous":

'Unreasonably dangerous' means dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

See *Signal Oil & Gas Co. v. Universal Oil Products,* 572 S.W.2d 320 (Tex.1978); *Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867 (Tex.1978); *Miller v. Bock Laundry Machine Co.,* 568 S.W.2d 648 (Tex.1977); *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977); and *Rourke v. Garza,* 530 S.W.2d 794 (Tex.1975). This definition was approved by the Court of Civil Appeals in the venue appeal of the case before us now, although the definition was considered in a different context.

■ In any event, any error in the failure to submit the prudent manufacturer element of the disjunctive test was harmless error. There is no complaint that any evidence offered by General Motors relative to this was excluded. The jury found that the automobile was defectively designed under an instruction incorporating the ordinary consumer test. It was immaterial

whether the jury might have also found that the roof structure was defectively designed from the standpoint of the prudent manufacturer test.

General Motors and Kliesing further contend that the definition of "unreasonably dangerous" given by the trial court was erroneous in not requiring that the expectations of the ordinary consumer be reasonable. It is argued that this, too, is required under our writings in *Henderson* and *Hopkins*. Again we disagree. The parties do not cite to an authority, and we have found none, requiring, or not, the addition of the reasonable expectation concept to the definition. The Court of Civil Appeals found the charge here in question to be defective in other respects but no point was made of the definition of unreasonably dangerous in terms of the ordinary consumer with the ordinary knowledge common to the community.

The court in *General Motors Corp. v. Simmons,* 545 S.W.2d 502 (Tex.Civ.App.1976), writ granted on other grounds, 558 S.W.2d 855 (Tex.1977), considered the contention that the court's definition of unreasonably dangerous should include the element of the reasonable expectations of the ordinary consumer as to the safety of the product. The court pointed out that the definition under attack was taken from the language used in § 402A of the RESTATEMENT (SECOND) OF TORTS, comment (i); and that the court could find no Texas case where this particular objection had been discussed. The court cited the suggestion in *Pyatt v. Engel Equipment, Inc.,* 17 Ill.App.3d 1070, 309 N.E.2d 225 (3rd Dist. 1974), that the comment (i) definition in its reference to ordinary use and ordinary knowledge carried the connotation of the reasonable man standard. See also *Mitchell v. Fruehauf Corp.,* 568 F.2d at 1145, where it was said that the balancing test there urged, i. e., the balancing of risks, utility and costs of the current and alternative design, was simply an expression of the concept of unreasonably dangerous; and, quoting from *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076 (5th Cir. 1973) (interpreting Texas law) that "unreasonably dangerous" is "a

concept that necessarily implies a balancing of a product's utility against the danger."

■ As indicated earlier, we have re-examined the manner in which a conscious design strict liability case is to be hereafter submitted to the jury. In so doing, we have determined that the bifurcated test and the writing as to this in *Henderson* and *Hopkins* will no longer govern. We are persuaded to this conclusion by the inclusiveness of the idea that jurors would know what ordinary consumers would expect in the consumption or use of a product, or that jurors would or could apply any standard or test outside that of their own experiences and expectations. See Green, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation,* 54 Tex.L.Rev. 1185 (1976). The stated reason for the alternative test of the prudent manufacturer does not justify its continued use.

Accordingly, we approve the form of jury submission stated in the forepart of this opinion to be effective in the trial of design defect strict liability cases after the date on which our judgment herein becomes final. The issue and instruction will be in this form when the considerations of utility and risks are present in the state of the evidence, and in such cases should serve as an appropriate aid to the jury in its deliberations. As previously noted, we recognized in *Rourke v. Garza, supra,* that under the evidence there the jury was justified in concluding that the risks of harm outweighed the utility of the product. And, as stated by the Court in *Ross v. Up-right, Inc.,* 402 F.2d 943, 946 (5th Cir. 1968), the demand "that the defect render the product unreasonably dangerous reflects a realization that many products . . . have both utility and danger."

There were evidentiary points urged by General Motors before the Court of Civil Appeals, and here, which were considered by the intermediate court and overruled. Among these were points attacking the legal and factual sufficiency of the evidence to support the answers to Special Issues One and Two that the roof structure was

defectively designed which was the producing cause of the injury to Turner; and points attacking the qualifications and testimony of Turner's expert witnesses. Other points relate to the exclusion of evidence of an out-of-court experiment conducted by General Motors during the trial. We agree with and adopt the writing of the Court of Civil Appeals in overruling these points.

Federal Motor Vehicle Safety Standard No. 216 was promulgated in December of 1971 by the National Highway Traffic Safety Administration and became effective on September 1, 1973, as a minimum standard for all cars subsequently manufactured. It sets forth a strength requirement for passenger car roofs and embodies an existing industry practice. General Motors proved the standard as an industry practice but the trial court excluded proof that the standard had been adopted by agencies of the federal government subsequent to the manufacture and sale of Turner's Chevrolet Impala and the accident in question. The Court of Civil Appeals found error in the exclusion of this proof; but because of errors also found in the charge to the jury, the court did not have occasion to determine the question required by Rule 503, Texas Rules of Civil Procedure, i. e., whether this error amounted to such a denial of the rights of General Motors as was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

■ As a rule, post-event regulations are inadmissible. See *Simms v. Southwest Texas Methodist Hospital*, 535 S.W.2d 192 (Tex.Civ.App.1976, writ ref'd n. r. e.) and *Bell v. Buddies Super-Market*, 516 S.W.2d 447 (Tex.Civ.App.1974, writ ref'd n. r. e.). Apart from this, we have determined from an examination of the record that the exclusion of the subsequent federal standard was not reasonably calculated to cause and probably did not cause the rendition of an improper verdict. See *Dennis v. Hulse*, 362 S.W.2d 308 (Tex.1962) and *Walker v. Texas Employers' Insurance Assoc.*, 155 Tex. 617, 291 S.W.2d 298 (1956). It was established by an employee-witness presented by General Motors that the industry practice was a joint effort of the industry and independent laboratories; that the standard was tested both by independent laboratories and by the industry; that automotive manufacturers importing vehicles into the United States do not use any other method of testing; that this is the standard to which vehicles have been built since 1973; and that passenger vehicles sold today in the United States comply with the practice.

The last witness in the trial presented by General Motors was questioned about a clinical paper he prepared on rollover accidents published in 1972 but relating back to collisions that he had studied for the preceding five years. On cross-examination, the witness testified:

Q. Now, you tell me that you recognize the Society of Automobile Engineers as authoritative?

A. I am not sure just what you mean by authoritative, certainly as the years have gone by, have been—it is an independent group of men and women worldwide who are devoted to all kinds of automotive interests, as far as being the authority, I am not sure that it's so, but they are the depositories as a group of people. We work together to make changes.

Q. Well, would you feel that they would be authoritative on the function of vertical restraint in regards to a seatbelt, a lap belt, in the event a car overturns concerning what belts are supposed to do?

A. There is certainly a standard. I am sure in that area, but I can't quote it to you, but whether it is an authority today, the Federal Government has the authority to set standards for vehicles—for vehicle design.

Q. Do you recognize the Society of Automotive Engineers as authoritative or not, Mr. Siegel?

A. Well, they are not the authority. The authority is the Federal Government in automotive design.

The foregoing illustrates the extent to which it was shown to the jury that the industry practice proved by General Motors

was of industry-wide acceptance and observance, with the inference that it was regarded as authoritative. The case was tried over a period of approximately two weeks and the evidence was developed at great length by competent and expert counsel for the parties. We do not believe it reasonable to conclude that the verdict of the jury would have been different had proof been allowed of the additional fact that the industry-wide practice had been subsequently adopted by federal agencies as a standard for automobile roof strength.

■ Finally, General Motors requested a special instruction to the jury to the effect that an award of damages to Turner would not be subject to federal income taxation. This was refused by the trial court. As pointed out in the majority opinion of the Court of Civil Appeals, it was heretofore ruled in *Missouri-Kansas-Texas Railroad Co. v. McFerrin,* 156 Tex. 69, 291 S.W.2d 931, 945 (1956), that such an instruction would be improper as introducing a wholly collateral matter into the damage issue. We reaffirm *McFerrin* as stating the correct rule.

The Motion for Rehearing filed on behalf of Robert A. Turner is granted. The Motion for Rehearing filed on behalf of General Motors Corporation is overruled. The opinion of the Court delivered March 21, 1979 and the judgment based thereon are withdrawn and set aside. The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

Concurring opinion by CAMPBELL, J., joined by SAM D. JOHNSON, J.

CAMPBELL, Justice, concurring.

I concur in the result, but the future consequences of certain expressions and pronouncements in the majority opinion compel me to express my dissent.

General Motors' contention that the trial court erred in failing to include in its definition of *unreasonably dangerous* both alternatives of the so-called bifurcated definition should be unequivocally rejected by a simple declaration of the obvious, unassailable principle that when a finding of either of two alternatives supports a ground of recovery or defense, the party asserting such ground of recovery or defense has the unquestionable right to waive a finding of either of the alternatives and rely solely on the other. To intimate possible error in this regard by resort to the harmless error rule can only result in confusion of the bar and bench.

In overruling this Court's prior decisions by discarding the Restatement's definition of *unreasonably dangerous,* the majority opinion fails to give due cognizance to the underlying policy and purpose of strict liability in tort, merges strict liability into negligence liability, and for all practical purposes abolishes strict liability in tort as to defective design. Liability for negligence is imposed for violation of a legal duty to exercise the care of an ordinary prudent person under the same or similar circumstances. Strict liability in tort of a manufacturer who places a defective product in the stream of commerce is imposed, not for violation of a duty to exercise due care, but because public policy favors imposition of the burden of a defective product upon the manufacturer instead of the consumer. The public interest in human safety requires the maximum possible protection for the user of the product; the manufacturer is in a better position to know the potential dangers in the product and test for and guard against same while the consumer generally must and does rely on the manufacturer's skill, knowledge and warnings of unexpected dangers; and, generally the manufacturer is in a better position to bear the loss from a faultless but dangerous product than is the consumer. James, *General Products—Should Manufacturers Be Liable Without Negligence?,* 24 Tenn.L.Rev. 923 (1957); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn. L.Rev. 791 (1966); Keeton, *Products Liability—Some Observations About Allocation of Risks,* 64 Mich.L.Rev. 1329 (1966). This Court recognized the distinction between the theories of negligence and strict liability by stating in *Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867, 871 (Tex.1978):

854

" . . . The care taken by the supplier of a product in its preparation, manufacture, or sale, is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production."

The Restatement's definition also recognizes this distinction by focusing solely on the contemplation of danger by the consumer without any implication of the manufacturer's contemplation or considerations. Apart from causation, the only finding necessary for strict liability under the Restatement is that the product was *dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.* The Restatement (Second) of Torts § 402A. This simply means, that by reason of the manufacturer's superior knowledge of a product's characteristics, if a danger beyond the contemplation of the ordinary consumer exists, the manufacturer must alter the product or warn the user to the extent necessary to bring such danger within his contemplation. When a jury is merely asked if a product, its condition or design is *unreasonably dangerous,* without the above definition, the question can only be interpreted by a jury to mean *"more dangerous than it would have been had the manufacturer acted as a prudent manufacturer."* Such is even more conclusive when specific negligence issues are also submitted because reasonable care is defined as *"the care which a person of ordinary prudence would use under like circumstances."* Edmiston v. Texas & N. O. R. Co., 135 Tex. 67, 138 S.W.2d 526 (1940). This is made even more obvious by the majority's instruction, that is a part of the definition, *"taking into consideration the utility of the product and the risk involved in its use."* Utility, risk, economics, etc., are mere evidence on the issue of a manufacturer's *negligence* in marketing the product or failing to remove or lessen the danger therein, and to instruct the jury to consider such evidentiary factors compels the jury to determine the issue solely on fault or non-fault of the manufacturer. Furthermore, such instruction by implied exclusion limits the jury's evidentiary consideration *solely* to utility and risk and by reason of the clause "Do you find from a preponderance of the evidence" the jury will usually decide the case on whether utility *outweighs* the risk. Though a product bears a danger that could be removed for a few pennies, its use would generally outweigh the risk.

I would not merge strict liability of a manufacturer into a mere negligence issue but would maintain the distinction between these two separate theories of liability as has the Restatement and our prior decisions in *McKisson v. Sales Affiliates,* 416 S.W.2d 787 (Tex.1967); *Darryl v. Ford Motor Company,* 440 S.W.2d 630 (Tex.1969); *Pittsburg Coca Cola v. Ponder,* 443 S.W.2d 546 (Tex. 1969); *Crocker v. Winthrop Lab.,* 514 S.W.2d 429 (Tex.1974); *General Motors v. Simmons,* 558 S.W.2d 855 (Tex.1977); *Miller v. Bock Laundry,* 568 S.W.2d 648 (Tex. 1978); *Armstrong Rubber v. Urquidez,* 570 S.W.2d 374 (Tex.1978); *Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867 (Tex. 1978); *Signal Oil & Gas v. Universal Oil Products,* 572 S.W.2d 320 (Tex.1978). In my opinion no satisfactory reasons have been advanced to support our departure from these decisions.

The bifurcated definition of *unreasonably dangerous* pronounced by this Court in *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex.1977), improperly permits the jury to find negligence or strict liability in one disjunctive question and I agree with the majority that such definition should be expressly overruled.

Lastly, the majority opinion states its new form of jury submission to be hereafter effective in the trial of *design* defect strict liability cases but does not state whether the new method of submission shall apply or not apply to other factual situations within the former ambit of strict liability in tort. Such ambiguity will place practitioners and jurists in a state of limbo

in the trial of all strict liability cases having alleged defects in addition to or other than those of design. The form of submission given by the trial court in this case, in exact conformity to that of *The Restatement (Second) of Torts* § 402A, was authored to cover and does in fact cover every factual situation within the purview of strict liability in tort and should be declared by this Court to be the proper submission in Texas.

For the above reasons, I dissent from the respected views of the majority as to the stated particulars.

SAM D. JOHNSON, J., joins in this concurring opinion.